[Cite as *Kinder Morgan Cochin L.L.C. v. Simonson*, 2016-Ohio-4647.]

COURT OF APPEALS
ASHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KINDER MORGAN COCHIN LLC | JUDGES: |
| | Hon. Sheila G. Farmer, P. J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J. |
| | Hon. John W. Wise, J. |
| -vs- | |
| | Case No. 15 COA 044 |
| ROBERT M. SIMONSON, TRUSTEE | |
| | O P I N I O N |
| Defendant-Appellant | |

CHARACTER OF PROCEEDING:     Appeal from the Court of Common Pleas,
Case No. 15-CIV-215

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     June 27, 2016

APPEARANCES:

For Plaintiff-Appellee

GREGORY D. BRUNTON
DANIEL J. HYZAK
BRUCE A. MOORE
REMINGER CO., LPA
65 East State Street, 4th Floor
Columbus, Ohio  43215

For Defendant-Appellant

DANIEL J. PLUMLY
ANDREW P. LYCANS
CRITCHFIELD, CRITCHFIELD &
JOHNSTON
225 N. Market Street, P. O. Box 599
Wooster, Ohio  44691

*Wise, J.*

{¶1} Defendant-appellant Robert M. Simonson, Trustee, appeals the decision of the Ashland County Court of Common Pleas granting summary judgment in favor of Appellee Kinder Morgan Cochin LLC.

## STATEMENT OF THE FACTS AND CASE

{¶2} Over the last five years, Ohio has experienced an increase in oil and gas development in the Utica and Marcellus Shale regions. The development of the Utica Shale in Ohio has dramatically changed the oil and gas industry in Ohio. (T. at 14-15). It was only within the last few years that the technology was developed to exploit this resource. (T. at 41). While previous production in the state consisted primarily of oil and natural gas, many of the wells which have been drilled in the Utica Shale recently primarily produce "wet gas," meaning natural gas liquids such as ethane, propane, and natural gasoline. (T. at 14-15, 33). Due to the significant number of wells which now produce wet gas, gas producers have been looking for ways to bring the substances produced in these wet gas fields to market. (T. at 14-15, 40). Unlike natural gas, wet gas must go through a fractionation or separation process prior to transport and is transported as a liquid rather than a gas. (T. at 41, 46).

{¶3} Appellee Kinder Morgan Cochin, LLC operates a petroleum products pipeline system from Saskatchewan, Alberta, Canada, through parts of the United States and Canada, to Windsor, Ontario, Canada. Kinder Morgan responded to these newly created transportation needs by assessing the industries' interest in a new interstate pipeline system that would move ethane and propane from Ohio to Canada. The proposed pipeline system is called Utopia. In order to evaluate the economic

viability of the Utopia Pipeline Project, Kinder Morgan's business development team engaged numerous petroleum producers and shippers operating in the region in order to determine whether the project had the necessary support to justify its enormous projected cost. (T. at 14-15). The interest assessment phase of the project was conducted primarily through an "Open Season" wherein Kinder Morgan sought out shipping commitments for the completed project. *Id.* During the Open Season, Kinder Morgan secured a transportation agreement with Nova Chemicals for approximately 90% of the Utopia Pipeline's initial transportation capacity, which allowed it to proceed from the interest assessment phase to the development phase.

{¶4}    In accordance with its pipeline development schedule, Kinder Morgan was required to apply for and receive approval of its proposed tariff structure from the Federal Energy Regulatory Commission (FERC). Kinder Morgan obtained FERC approval of its proposed tariffs pursuant to a Declaratory Order issued in 2015. (T. at 16). Under the FERC Declaratory Order, Kinder Morgan is required to "keep 10 percent of the capacity of the pipeline available for ... walk-up shippers ... [whose] rates also have to be approved by the Federal Energy Regulatory Commission." *Id.* Under FERC rules, walk-up and public shippers alike cannot be discriminated against when it comes to transportation of petroleum on the Utopia Pipeline. (T. at 54). This is true even if they happen to elect more than their specifically allotted 10% capacity due to specific nondiscriminatory allocation procedures set by FERC. *Id.* In addition to needing FERC approval of its tariffs, Kinder Morgan was required to obtain additional pipeline permits from the Ohio Environmental Protection Agency, the Army Corp. of Engineers, along with review/consultation with the U.S. Fish and Wildlife Service and the Ohio Historic

Preservation Office, before any construction of the Utopia Pipeline could begin (the "Pipeline Permits"). (T. at 24).

{¶5} Of critical importance in the underlying lawsuit is the fact that the required Pipeline Permits would not be granted by the relevant bodies until Kinder Morgan had completed certain civil, archeological and environmental surveys on every tract of land situated along the Utopia Pipeline route. (T. at 10). Further, completion of the applications for the necessary Pipeline Permits required that Kinder Morgan have access to every tract of land situated along the Utopia Pipeline route. (T. at 11).

{¶6} Given the exacting requirements of the Utopia Pipeline's permitting process, Kinder Morgan's survey access to Appellant Robert Simonson's property was essential to ensuring that the information provided in its Pipeline Permit applications was correct. *Id.* Delays in the permitting process would cause delays in the development schedule, thereby risking Kinder Morgan's ability to meet its contractual in-service dates. (*Id.* at 5). For these reasons, Kinder Morgan's completion, submission, and approval of the Pipeline Permit applications was vital for Kinder Morgan to ensure its investors and committed shipper that it would be able to meet its contractual obligations. *Id.*

{¶7} Kinder Morgan contacted Appellant and requested permission to enter onto his property for the purpose of conducting such pipeline surveys but was ultimately informed that Kinder Morgan would have to seek legal action because an agreement could not be reached. (See Affidavit Certificate of Daniel J. Hyzak, Esq.)

{¶8} On October 30, 2015, Appellee Kinder Morgan Cochin LLC ("Kinder Morgan") filed a Complaint for Declaratory Relief; Temporary Restraining Order;

Preliminary Injunction; Permanent Injunction against Robert M. Simonson, Trustee ("Simonson"). The Complaint sought an order granting Kinder Morgan access to Simonson's property for the purpose of conducting surveys, inspections and examinations under R.C. §163.03. The Complaint further sought a temporary restraining order, preliminary injunction, and permanent injunction barring Simonson from obstructing Kinder Morgan's access to his property to conduct such surveys, inspections and examinations.

{¶9}   That same day, Kinder Morgan filed a Motion for Temporary Restraining Order and Preliminary Injunction and Permanent Injunction (hereinafter "Motion").

{¶10} On November 23, 2015, the trial court held an evidentiary hearing on the Motion.  At the beginning of that hearing, the court expressed its understanding that the purpose of the hearing was essentially to determine the definition of petroleum. (T. at 7). The trial court further indicated that it felt the Fifth District Court of Appeals' decision in *Ohio River Pipe Line, L.L.C. v. Henley,* 144 Ohio App. 3d 703 required a finding that "petroleum" includes "natural gas liquids" such as ethane and propane. (T. at 35-37).

{¶11} On December 10, 2015, the trial court issued a judgment entry finding that: (1) Kinder Morgan is a common carrier; (2) this Court's decision in *Henley* required a broad reading of the term "petroleum" as used in R.C. § 1723.01 and that natural gas liquids fell within such a broad reading; and (3) the trial court did not need to determine whether the proposed pipeline constitutes a public use in order to allow access pursuant to R.C. §163.03. The trial court held that Kinder Morgan could enter onto Simonson's property and enjoined Simonson from interfering with Kinder Morgan's "statutory right" to enter the property and conduct surveys.

{¶12} Appellant Simonson now appeals, assigning the following errors for review:

## ASSIGNMENTS OF ERROR

{¶13} "I. THE TRIAL COURT ERRED IN HOLDING THAT THE TERM PETROLEUM, AS USED R.C. § 1723.01, INCLUDES NATURAL GAS LIQUIDS SUCH AS ETHANE AND PROPANE AND GRANTING A PERMANENT INJUNCTION BASED UPON THAT HOLDING.

{¶14} II. THE TRIAL COURT ERRED IN HOLDING THAT KINDER MORGAN QUALIFIES AS A COMMON CARRIER UNDER OHIO LAW WITH REGARD TO THE UTOPIA PIPELINE PROJECT AND GRANTING A PERMANENT INJUNCTION BASED UPON THAT HOLDING.

{¶15} III. THE TRIAL COURT ERRED IN HOLDING THAT KINDER MORGAN HAD PREVAILED UPON THE MERITS, THEREBY ENTITLING IT TO A PERMANENT INJUNCTION, WITHOUT FIRST DETERMINING WHETHER KINDER MORGAN'S PROPOSED USE OF SIMONSON'S PROPERTY WOULD CONSTITUTE A PUBLIC USE SUCH THAT KINDER MORGAN COULD INVOKE AN EMINENT DOMAIN STATUTE TO ENTER ONTO SIMONSON'S PROPERTY.

### Permanent Injunction

{¶16} The standard of review for this Court regarding the granting of an injunction by a trial court is whether the trial court abused its discretion. *Perkins v. Quaker City,* 165 Ohio St. 120, 125, 133 N.E.2d 595 (1956). In an action for a temporary or permanent injunction, the plaintiff must prove his or her case by clear and

convincing evidence. *Franklin Cty. Dist. Bd. of Health v. Paxon,* 152 Ohio App.3d 193, 202, 2003–Ohio–1331, 787 N.E.2d 59 (10th Dist.).

**{¶17}** Clear and convincing evidence has been defined by the Supreme Court of Ohio as that measure or degree of proof that will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt, as in criminal cases. *Id.* It does not mean clear and unequivocal. *Id.*

**{¶18}** In determining whether to grant injunctive relief, courts take into consideration the following four factors: (1) the likelihood or probability of a plaintiff's success on the merits; (2) whether the issuance of the injunction will prevent irreparable harm to the plaintiff; (3) what injury to others will be caused by the granting of the injunction; and, (4) whether the public interest will be served by the granting of the injunction. *Corbett v. Ohio Bldg. Auth.,* 86 Ohio App.3d 44, 49, 619 N.E.2d 1145 (10th Dist.1993).

## I.

**{¶19}** In his First Assignment of Error, Appellant argues that the trial court erred in holding that the term petroleum, as used R.C. §1723.01, includes natural gas liquids such as ethane and propane.  We disagree.

**{¶20}** In *Ohio River Pipeline LLC v. Henley*, 144 Ohio App.3d 703, this Court held that "petroleum," as used in R.C. §1723.01, included refined substances and petroleum by-products, and was not limited to natural substances. In reversing the trial

court's holding that the term petroleum means only naturally occurring substances and not petroleum by-products, this Court stated:

> We must read R.C. Title 1723 as a whole to understand to what substances the legislature referred in using the term "petroleum." R.C. 1723.06 uses the term "oils" instead of "petroleum." The statute does not distinguish between the two words but uses them interchangeably. Elsewhere in the Revised Code, the legislature has defined the words "petroleum" and "oil" synonymously. *See* R.C. 3737.87; R.C. 3746.01; R.C. 1509.01. The Ohio Supreme Court has recognized that it is helpful to look to definitions elsewhere in the Revised Code to determine the meaning of terms not defined in a particular statute. *See Akron Transport Co. v. Glander* (1951), 155 Ohio St. 471, 44 O.O. 435, 99 N.E.2d 493.

**{¶21}** In construing statutory terms, we are guided by the legislature's use of the same terms defined elsewhere in the Revised Code. *See Cablevision of the Midwest, Inc. v. Gross* (1994), 70 Ohio St.3d 541, 639 N.E.2d 1154.

**{¶22}** As stated above, the Ohio legislature has defined "petroleum" and "oil" in other sections of the Revised Code to include refined petroleum liquids.

**{¶23}** R.C. §3737.87(J), which refers to underground storage tanks, provides:

> 'Petroleum' means oil or petroleum of any kind and in any form, including, without limitation, crude oil or any fraction thereof, petroleum, gasoline, kerosene, fuel oil, oil sludge, oil refuse, used oil, substances or additives utilized in the refining or blending of crude petroleum or petroleum stock, natural gas, natural gas liquids, liquefied natural gas,

synthetic gas usable for fuel, and mixtures of natural gas and synthetic gas.

{¶24} R.C. §3746.01(L) also contains the identical definition of petroleum.

{¶25} Other courts have also construed the term "petroleum" to include refined petroleum products. *See Nat. Gas & Oil Corp. v. Hamby* (Mar. 20, 1981), Muskingum App. No. CA 80-27, unreported, 1981 WL 6185, citing *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 374 N.E.2d 146.

{¶26} In the instant case, the evidence showed that, within the petroleum industry, "petroleum" included the refined products that Kinder Morgan intends to transport through the pipeline. The trial court heard undisputed testimony from Allan Campbell that within the petroleum pipeline industry, the definition of petroleum includes natural gas liquids such as ethane and propane. (T. at 9).

{¶27} Further, Webster's Third New International Dictionary (1993), defines "propane" as a gas that occurs naturally in crude petroleum and natural gas. Therefore, propane is a "natural gas".

{¶28} Based on the foregoing, we find that the trial court did not err in finding that the term petroleum as used in R.C. §1723.01 includes the natural gas liquids ethane and propane.

{¶29} Appellant's First Assignment of Error is overruled.

**II.**

{¶30} In his Second Assignment of Error, Appellant argues the trial court erred in holding that Kinder Morgan qualifies as a common carrier under Ohio law with regard to the Utopia Pipeline project. We disagree.

**{¶31}** R.C. §1723.08 provides:

With respect to the transporting by it of natural gas, petroleum, coal or its derivatives, water, and electricity, a company described in section 1723.01 of the Revised Code is a common carrier and is subject to the duties and liabilities of a common carrier under the laws of this state. A company described in section 1723.01 of the Revised Code includes any firm, partnership, voluntary association, joint-stock association, company, or corporation, wherever organized or incorporated, when engaged in the business of transporting petroleum through tubing, pipes, or conduits as a common carrier.

**{¶32}** At the hearing in this matter, Kinder Morgan provided testimony that it was in fact a common carrier pipeline "engaged in the business of transporting petroleum through tubing, pipes, or conduits." (T. at 15-17).

**{¶33}** Upon reviewing the relevant case law, we find that "common carrier" is consistently defined as "one who undertakes to transport persons or property from place to place, for hire, and holds itself " 'out to the public as ready and willing to serve the public indifferently.' " *Harper v. Agency Rent–A–Car, Inc.* (C.A.5, 1990), 905 F.2d 71, quoting *Burnett v. Riter* (Tex.App.1925), 276 S.W. 347, 349; 13 Ohio Jurisprudence 3d (1995) 567, Carriers, Section 1. The common carrier must hold 'itself ready to serve the public impartially to the limit of its capacity.' *Id.* "The fundamental test of common carriage is whether there is a public profession or holding out to serve the public." *New England Transrail, L.L.C. Construction, Acquisition, and Operation Exemption,* STB Finance Docket No. 34797, 2007 WL 1989841, (June 29, 2007).

{¶34} Here, we find that the evidence presented supports the trial court's finding that the Utopia Pipeline is a common carrier pipeline. Testimony was presented that Kinder Morgan holds itself out to be a common carrier and that the pipeline will be available to anyone wanting to transport their petroleum products. (T. at 16-18). Testimony was presented that Kinder Morgan held an "Open Season" wherein anyone who wanted to reserve capacity of the Utopia Pipeline to transport petroleum was able to sign a transportation agreement with Kinder Morgan. (T. at 15-16). Evidence was also presented that both Kinder Morgan and its committed shipper, Nova Chemicals Corp. both recognized Kinder Morgan as a common carrier in their Transportation Services Agreement. (See Nov. 23, 2015 Hearing).

{¶35} Based on the evidence presented, we find that the trial court did not err in finding that Appellee Kinder Morgan is a common carrier with regard to the Utopia Pipeline.

{¶36} Appellant's Second Assignment of Error is overruled.

**III.**

{¶37} In his Third Assignment of Error, Appellant argues that the trial court erred in failing to determine whether Kinder Morgan's proposed use of Simonson's property would constitute a public use. We disagree.

{¶38} In the case *sub judice*, Appellee's action for a restraining order and injunction were filed pursuant to R.C. 1723.01 and 163.03, which provide as follows:

{¶39} **R.C. 1723.01 Power to enter upon and appropriate land**

If a company is organized ... for transporting natural or artificial gas, petroleum, coal or its derivatives, water, or electricity, through tubing,

pipes, or conduits, or by means of wires, cables, or conduits; for storing, transporting, or transmitting water, natural or artificial gas, petroleum, or coal or its derivatives, or for generating and transmitting electricity; then such company may enter upon any private land to examine or survey lines for its tubing, pipes, conduits, poles, and wires, ... and may appropriate so much of such land, or any right or interest therein, as is deemed necessary for the laying down or building of such tubing, conduits, pipes, dams, poles, wires, reservoir, plant, powerhouse, storage yards, wharves, bridges, workshops, receiving and delivery structures or facilities, pumping stations, and any other buildings, structures, appliances, or facilities necessary to the purposes of such companies, ...

**{¶40}  R.C. 163.03 Entry for surveys, examinations, etc.; notice; restitution for damages**

Any agency may, upon the notice prescribed in this section, prior to or subsequent to the filing of a petition pursuant to section 163.05 of the Revised Code, enter upon any lands, waters, and premises for the purpose of making such surveys, soundings, drillings, appraisals, and examinations as are necessary or proper for the purpose of the agency under sections 163.01 to 163.22, inclusive, of the Revised Code, and such entry shall not constitute a trespass. Notice of such proposed entry shall be given to the owner or the person in possession by such means as are

reasonably available not less than forty-eight hours nor more than thirty days prior to the date of such entry.

The agency shall make restitution or reimbursement for any actual damage resulting to such lands . . .

**{¶41}** As set forth above, Appellee is only at the preliminary survey stage. No Petition to Appropriate has yet been filed, which is when a hearing on "public use" and "necessity" would be determined.

**{¶42}** Based on the statutes as set forth herein, we find that the trial court correctly held that Appellee Kinder Morgan has the right to enter onto Appellant's property for the purpose of surveying same to determine the potential viability of the Utopia Pipeline project.

**{¶43}** Appellant's Third Assignment of Error is overruled.

**{¶44}** For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas of Ashland County, Ohio, is hereby affirmed.

By: Wise, J.

Farmer, P.J., and

Hoffman, J., concurs.

JWW/d 0621